IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

USA FOR THE USE AND BENEFIT OF   )
SPIRTAS WORLDWIDE, LLC,               )
                                     )
           Plaintiff,          )
                                     )   **Case No. 3:21-CV-00182-MAB**
vs.                                  )
                                   )
SGLC CONSULTING LLC, ET AL.,     )
                                   )
          Defendants.

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

### BACKGROUND

Plaintiff, The United States for the Use and Benefit of Spirtas Worldwide, LLC, ("Plaintiff") filed this lawsuit on February 16, 2021 pursuant to 40 U.S.C. § 3131, *et seq.*, ("The Miller Act"), for uncompensated subcontracting work Plaintiff alleges was conducted pursuant to a Trade Partners Agreement ("TPA") (Docs. 1, 43, 60). Prior to filing his lawsuit, Plaintiff contends that Defendant SGLC ("SGLC") entered into a contract with the Department of the Interior, U.S. Fish and Wildlife Service, for a demolition project and cleanup of a particular area located at the Crab Orchard National Wildlife Refuge ("Crab Orchard") in Marion, Illinois (Doc. 60, pp. 1-2). Pursuant to the Miller Act, Defendant Westchester Fire Insurance Company ("Westchester") provided payment and performance bonds for this project (*Id.* at p. 2).

Plaintiff signed a TPA with SGLC on or around September 1, 2020 (*Id.*). While the parties disagree as to the applicability of certain terms of this agreement, the agreement

generally outlined that Plaintiff would perform as a subcontractor on projects for SGLC. *Id.* Approximately two months later on November 4, 2020, SGLC ordered Plaintiff off of the project. Plaintiff complied and stopped working, but, to date, SGLC has not paid Plaintiff for the work performed during those two months. *Id.* Approximately three months later, Plaintiff filed this lawsuit, attempting to recoup the cost of materials and labor for the projects Plaintiff completed for SGLC. When Plaintiff first filed the lawsuit, there were a total of four claims: 1) a Miller Act claim; 2) implied subcontract; 3) quantum meruit; and 4) fraud (Doc. 1).

Plaintiff filed a motion to amend its complaint on March 30, 2021, seeking to correct the name of one of the Defendants (Doc. 36). As the Defendants had not filed their responsive pleadings to Plaintiff's complaint, the Court granted Plaintiff's motion and the first amended complaint was filed on April 8, 2021 (Docs. 42, 43). After seeking a few extensions of time, SGLC filed a motion to compel arbitration (Doc. 47). The same day, Defendant Grant Cunningham ("Cunningham") filed his motion to dismiss (Doc. 48). The following day, on April 22, 2021, Westchester filed a motion to stay the proceedings or, in the alternative, motion for extension of time to file a response to Plaintiff's amended complaint (Doc. 50). Westchester explained that, to avoid bifurcated proceedings, it would prefer to file its responsive pleading to Plaintiff's complaint once the motion to compel arbitration was decided. As Plaintiff did not object to this motion, the Court granted it on July 7, 2021, and stayed Westchester's responsive pleading (Doc. 55).

On August 26, 2021, Plaintiff filed its second motion to amend/correct the complaint, seeking to file an amended complaint eliminating Counts I and II of Plaintiff's

April 8, 2021 complaint. Plaintiff argued that filing this complaint would moot the motion to compel arbitration, saving the Court the trouble of issuing a decision on that motion (Doc. 56, pp. 1-2). SGLC and Cunningham opposed the motion, filing their joint response on September 1, 2021 (Doc. 58). The Court granted Plaintiff's motion and allowed Plaintiff one more opportunity to amend the complaint, which it did on November 29, 2021 (Doc. 59). Additionally, the Court denied, without prejudice and with leave to refile, SGLC and Cunningham's motions (Docs. 47; 49).

The operative complaint is similar to Plaintiff's first amended complaint in that Plaintiff brings a Miller Act claim against SGLC and then a second claim under the Illinois Consumer Fraud and Deceptive Practices Act (815 ILL. COMP. STAT. § 505/2) against Cunningham (Doc. 60, pp. 1; 8-10). In filing this complaint, Plaintiff dropped its two other claims: implied subcontract and quantum meruit claims (Doc. 43, pp. 8-10). SGLC, Cunningham, and Westchester filed their renewed motions to dismiss and to stay on December 17 and 20, 2021, respectively (Docs. 61, 62, 63). These motions, and the responsive briefings, are presently before the Court.

<u>DISCUSSION</u>

Plaintiff brings two claims against Defendants in this matter. The first is a Miller Act claim against SGLC. The second is an Illinois fraud claim against SGLC's President, Co-Defendant Grant Cunningham. Westchester is added as a Defendant in Plaintiff's Miller Act claim, as they issued the bonds to both SGLC and Plaintiff for the construction work at the Crab Orchard site. Before the Court are two main pending motions. The first is SGLC's motion to dismiss Count I, or in the alternative, motion to compel arbitration

as to Count I and stay the proceedings (Doc. 61). The second is Cunningham's renewed motion to dismiss Count II of Plaintiff's amended complaint. While the Court will address these motions separately for the majority of this Order, there are certain arguments that Plaintiff makes in responses to both motions that may be referenced.

## I.   SGLC's Motion to Dismiss Count I for Improper Venue

Plaintiff brings this case in federal court first and foremost under the Miller Act. Count I of Plaintiff's complaint, which is against SGLC, is Plaintiff's Miller Act claim. The Miller Act, 40 U.S.C. § 3131 *et seq.*, seeks to protect subcontractors against nonpayment for work performed on federal government construction projects by requiring the prime contractor to provide a payment bond on which the subcontractor can then make a claim for payment. *A&C Constr. & Installation, Co. WLL v. Zurich Am. Ins. Co.*, 963 F.3d 705, 706 (7th Cir. 2020). Courts within the Seventh Circuit have held that a contract of some sort is necessary for a Miller Act claim. "On its face, the Miller Act provides a right of action only for those who have a contract to furnish labor or material to the contractor or subcontractor; it does not provide a right of action for those who have a guaranty agreement with the contractor or subcontractor." *U.S., Dep't of the Navy v. Norden Enterprises, LLC*, No. 01-C-8968, 2004 WL 42318, at *5 (N.D. Ill. Jan. 6, 2004) (quoting *U.S. ex rel. Gold Bond Bldg. Prods. v. Blake Constr. Co., Inc.*, 820 F.2d 139, 142 (5th Cir.1987)). Furthermore, courts have repeatedly held that Miller Act claims are arbitrable. *Gatlin Plumbing & Heating, Inc. v. Welty Bldg. Co.*, No. 212-CV-114-TLS, 2013 WL 704736, at *7 (N.D. Ind. Feb. 26, 2013); *U. S. for Use & Benefit of Frank A. Trucco & Sons Co. v. Bregman Const. Corp.*, 256 F.2d 851 (7th Cir. 1958).

SGLC argues that dismissal of the Miller Act claim is appropriate for two main reasons (Doc. 61). The first is that an agreement to arbitrate exists between the parties, contained in the parties' TPA; therefore, Plaintiff's claim must be dismissed so that the parties can seek arbitration pursuant to the language of the TPA. SGLC further argues that Plaintiff cannot avoid the arbitration clause in the TPA by only filing certain claims, like a claim under the Miller Act, because ultimately, the TPA governs the parties' interactions. Any question as to its contents must be settled by the arbitrator and not the district court.[1] Plaintiff counters each of SGLC's arguments, basing the response on Plaintiff's central belief that the TPA is not a valid and legally binding arbitration agreement. Furthermore, Plaintiff argues that the undersigned should examine the TPA and find as such, and that this determination is best left to the district court as opposed to the arbitrator. Based on these arguments, the Court must determine whether the TPA containing an arbitration provision is actually valid and commands dismissal.

As an initial matter, motions to compel arbitration concern venue and, as SGLC has asserted here, are properly addressed under Federal Rule of Civil Procedure 12(b)(3).[2] *Muhammad v. Tree*, No. 18 C 04192, 2020 WL 1530750, at *2 (N.D. Ill. Mar. 31,

---

[1] SGLC asserts a third argument pertaining to Westchester only. SGLC argues that while staying the case as to Westchester would be appropriate, it is better for the Court to dismiss those claims as well for purposes of judicial economy (Doc. 61, p. 11).

[2] There are some courts within this Circuit that disagree as to whether a motion to compel arbitration must be brought under 12(b)(3). Some courts argue that motions to compel arbitration should be brought under Section 4 of the FAA instead because only federal venue laws, and not contractual forum selection clauses (*e.g.*, contracts containing an arbitration clause) dictate whether a case is brought, and stays in, federal court. Specifically, the Northern District explains "Rule 12(b)(3) allow[s] dismissal only when venue is 'wrong' or 'improper.' Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws, and those provisions say nothing

2020) (citing *Grasty v. Colo. Tech. Univ.*, 599 F. App'x 596, 597 (7th Cir. 2015)). *See also Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014); *Johnson v. Orkin, LLC*, 556 F. App'x 543, 544 (7th Cir. 2014) (an arbitration clause is "simply a type of forum-selection clause," and a motion seeking dismissal based on an agreement to arbitrate therefore should be decided under Rule 12(b)(3)). The Court may consider materials outside the pleadings when evaluating such a motion. *Muhammad*, 2020 WL 1530750 at *2 (citation omitted).

Since SGLC has asserted that an arbitration agreement exists between the parties, this matter implicates the Federal Arbitration Act ("FAA"). The FAA "reflects both a liberal federal policy favoring arbitration ... and the fundamental principle that arbitration is a matter of contract." *Gupta v. Morgan Stanley Smith Barney, LLC*, 934 F.3d 705, 710 (7th Cir. 2019) (quoting *AT&T Mobility LLC v. Concepcion*, 564 U.S. 333, 339 (2011). *See also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."). The FAA reflects the overarching principle that arbitration is a matter of

---

about a forum-selection clause." *Lukis v. Whitepages Inc.*, 549 F. Supp. 3d 798, 807 (N.D. Ill. 2021) (quoting *Atlantic Marine Construction Co. v. United States District Court for the Western District of Texas*, 571 U.S. 49, 55 (2013)). *See also Brickstructures, Inc. v. Coaster Dynamix, Inc.*, 952 F.3d 887, 890 (7th Cir. 2020) (rejecting a party's argument that a motion invoking an arbitration provision must be brought under Rule 12(b)(3), and holding that the "motion to compel arbitration was in substance a motion under § 4 of the FAA," though the arbitration agreement did not indicate any arbitral locale). Even so, the Seventh Circuit held that resolving the underlying issues with arbitration was necessary at the beginning stages of litigation, regardless of how it was brought before the Court, which is what the Court must do here. *Brickstructures*, 952 F.3d at 890 ("[T]he substance of a motion…counts, not its label.") (citation omitted).

contract. *Jackson v. Payday Financial, LLC,* 764 F.3d 765, 773 (7th Cir. 2014) (citing *Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 67 (2010)). Under the FAA, arbitration agreements "'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 740 (7th Cir. 2010), citing 9 U.S.C. § 2. A court should grant a motion to compel arbitration where there is (1) a written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). Whether a valid arbitration agreement exists and whether a case is subject to arbitration pursuant to this agreement is a threshold issue a court must decide early in the case. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-83 (2002); *Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) (citing 9 U.S.C. § 2). *See also Biermann v. Comcast Cable Commc'ns Mgmt., LLC*, No. 20 C 2986, 2020 WL 6870824, at *2 (N.D. Ill. Nov. 23, 2020). Ultimately, courts are directed to "'rigorously enforce' arbitration agreements according to their terms." *Jackson*, 764 F.3d at 774-75, *quoting Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221 (1985).

Before addressing any of the parties' substantive arguments related to whether the arbitration agreement is valid and applicable to the present matter, the Court must decide whether it is appropriate for the undersigned to even examine the TPA and arbitration provision, or whether this inquiry must be left up to the arbitrator. Thus, the Court first turns to the arbitration provision itself to determine whether the initial inquiry can be decided by the undersigned.

### A. The Arbitration Provision and the Court's Involvement

Plaintiff alleges it was a subcontractor to SGLC on a demolition project at the Crab Orchard Project (Doc. 60, p. 1). Plaintiff highlights in its amended complaint that it executed a TPA with SGLC on September 1, 2020. *Id.* Plaintiff's complaint describes this TPA as outlining that Plaintiff would perform work as a subcontractor on various projects, which were to be named later (*Id.* at p. 2).

The TPA contains a series of provisions (Doc. 61, pp. 15-18). For example, the TPA outlines the scope of work to be completed by each party (*e.g.,* "The subcontract shall furnish, at its own expense, all tools, machinery, equipment, labor, management, and Project supervision for each Project") as well as how the TPA could be terminated (*Id.* at pp. 15; 17). The arbitration clause, at issue, can be found on the last page of the TPA and reads as follows:

> <u>Arbitration.</u> Any dispute, claim or controversy arising out of or relating to this agreement or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by arbitration in Edwards, CO before one arbitrator. At the option of the first to commence an arbitration, the arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(*Id.* at p. 18).

Plaintiff admits that its representative signed the TPA that includes this arbitration agreement. Plaintiff explains that it believed SGLC signed this TPA as well, and it was not until after Plaintiff had worked to secure the Crab Orchard Project for SGLC, and began construction work on the site, that it learned SGLC had not signed the TPA (Doc.

60, pp. 3-4). Plaintiff argues that because this TPA was never signed by SGLC, it is not binding and, therefore, dismissal and arbitration are not appropriate.

Challenges to the validity of arbitration agreements can be divided into two main types. *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444 (2006). One type challenges the validity of the agreement to arbitrate only and not the overall contract or document in which the arbitration agreement appears. The other challenges the contract as a whole, either in a way that directly affects the entire agreement (*e.g.,* the entire agreement, or contract, was fraudulently induced), or by arguing that the illegality of one of the contract's provisions renders the whole contract invalid. *Id.* Ultimately, whether a Court or an arbitrator must resolve a dispute regarding a contract depends on the type of dispute brought by the parties. The main inquiry is whether the party challenging the contract believes it is an issue related to contract formation, validity of the contract as a whole, or validity of the arbitration provision within the contract. *Id.*

It is well-established that when presented with a contract *containing an arbitration agreement*, "[u]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator." *Id.* at 445–46. In other words, "a court may consider a claim that a contracting party was fraudulently induced to include an arbitration provision in the agreement *but not claims that the entire contract was the product of fraud.*" *James v. McDonald's Corp.,* 417 F.3d 672, 680 (7th Cir. 2005) (emphasis added) (citing *Sweet Dreams Unlimited v. Dial–A–Mattress Int'l, Ltd.,* 1 F.3d 639, 641 n. 4 (7th Cir. 1993)). *See also United Ironworkers, Inc. v. Travelers Prop. Cas. Co. of Am.,* No. 3:18-CV-553-NJR-DGW, 2019 WL 77334, at *5 (S.D. Ill. Jan. 2, 2019). Whether a contract is valid and

not the product of deceptive practices is a different inquiry than if the parties to a contract ever concluded their negotiations and finalized the contract overall. *Buckeye Check Cashing*, 546 U.S. at 444 n.1. Put simply, "[t]he judiciary rather than an arbitrator decides whether a contract came into being." *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001).[3]

The parties disagree whether the Court or an arbitrator can decide the issues before the Court. SGLC argues that the parties agreed, per what SGLC says is a valid arbitration clause, that the arbitrator, not the district court, must decide all disputes between the parties, "including the determination of the scope or applicability of this agreement to arbitrate" (Doc. 61, p. 18). Plaintiff argues that the district court must first decide whether there is a valid contract and then decide whether parties have agreed to submit this particular dispute to arbitration (Doc. 65, p. 5).[4] In support of its argument,

---

[3] Put another way, challenges to the validity of the entire contract containing an arbitration provision go to the arbitrator "because arbitration provisions are severable from the remainder of the contract; if a party challenges the contract, 'but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract'." *Zhan v. Hogan,* 2018 WL 9877970, at *5 (C.D. Ill. Dec. 18, 2018), quoting *Buckeye*, 546 U.S. at 446.

[4] This argument highlights the first of Plaintiff's inconsistencies across the briefing presently before the Court. In Plaintiff's response to Cunningham's motion, Plaintiff seems to argue that Cunningham, the president of SGLC, induced Plaintiff into the TPA through deceptive and fraudulent acts. But here, in Plaintiff's response to SGLC's motion to dismiss, Plaintiff argues that the TPA was never finalized. As highlighted here, the Court's role in deciding such a quandary hinges on this very distinction. This places the Court in the difficult position of having to summarize Plaintiff's overall argument from two pleadings that, at times, oppose one another and trigger different analyses. As Plaintiff argues in his response here that the TPA was never finalized, the Court will focus on that argument. The Court notes, however, that precedent is clear—if Plaintiff contends that the overall contract was entered into because of fraud or through deceptive practices, the arbitrator is the one to decide that issue. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-04 (1967). *See also James,* 417 F.3d at 680 (quoting *Sweet Dreams Unlim.* 1F.3d at 641 n.4 ("[A] court may consider a claim that a contracting party was fraudulently induced to include an arbitration provision in the agreement but not claims that the entire contract was the product of fraud")).

Plaintiff relies on the fact that the TPA was not signed by SGLC, arguing this means it is not a legal, valid contract. As precedent is clear that the undersigned may determine whether a contract came into being, the Court first turns to whether a contract was formed, or in other words, whether the contract concluded. *Wisconsin Loc. Gov't Prop. Ins. Fund v. Lexington Ins. Co.*, 840 F.3d 411, 414 (7th Cir. 2016) (citing *Sphere Drake Ins. Ltd.*, 256 F.3d at 591).

### B. Was a Contract Formed?

Plaintiff argues the TPA, containing the arbitration provision, was not a valid contract, because "there was no negotiation, agreement, or meeting of the minds concerning an arbitration agreement" (Doc. 65, p. 7). Plaintiff calls the TPA a "poorly drafted form merely handed to…Plaintiff" who was instructed to sign it in order for SGLC to receive the bond from Westchester for the Crab Orchard Project. *Id.* He points to a provision of the TPA that states, "The exclusive venue relating to this Agreement shall be in the State where each Project is located,"[5] as incongruous with the arbitration provision contained in the TPA. That provision states, "Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof…shall be determined by arbitration in Edwards, CO" (Doc. 61, p. 18). Plaintiff argues that because these provisions conflict, it shows there was no "meeting of the minds" between SGLC and Plaintiff, and the TPA is not enforceable

---

[5] Provision 10 of the TPA reads, in its entirety, as follows: "The exclusive venue relating to this Agreement shall be in the State where each Project is located. Any claim and/or cause of action between the Parties shall only be initiated and maintained in this exclusive venue. This Agreement shall be construed and interpreted in accordance with the laws of the State of Colorado" (Doc. 61, p. 17).

(Doc. 65, pp. 7-8). Furthermore, Plaintiff argues there was no consideration flowing back from SGLC, as SGLC did not sign the TPA and "did not bring any demolition experience to the table" (*Id.* at p. 8). Finally, Plaintiff points to a series of e-mails sent from Cunningham in which he "disavow[s]" the TPA (*Id.* at p. 9, citing to Docs. 51-2; 51-3; 51-4).

The complaint, and some of Plaintiff's arguments in response to the other pending motions, tell a slightly different story. Plaintiff explains in the complaint that it signed the TPA and forwarded it to SGLC "with the assurances by Grant Cunningham, President and Owner of SGLC, and understanding by the Plaintiff, that the TPA would be signed by Defendants, SGLC" (Doc. 60, p. 3). Plaintiff explains that because Plaintiff believed the TPA was signed and governing, Plaintiff prepared for and participated in helping SGLC in "many pre-bid" actions (*Id.* at p. 4). This included attending pre-bid site visits and preparing pre-construction submittals. *Id.*

In order to determine whether a valid contract was created by Plaintiff and SGLC, the Seventh Circuit and Illinois Supreme Court are clear that the analysis should be based on state-law principles of contract formation. *Gupta,* 934 F.3d at 711 (internal citations omitted). The three basic elements of a contract are an offer, acceptance, and consideration. *Id.* at 712 (*citing Melena v. Anheuser-Busch, Inc.,* 847 N.E.2d 99, 109 (Ill. 2006)). Most jurisdictions require mutual assent in contract formation and, specifically, Illinois courts use an objective lens to determine whether mutual assent is present. *Sgouros v. TransUnion Corp.,* 817 F.3d 1029, 1034 (7th Cir. 2016) (citing *Beverly v. Abbott Labs.,* 817 F.3d 328, 333 (7th Cir. 2016)); *Vill. of S. Elgin v. Waste Mgmt. of Ill., Inc.,* 810

N.E.2d 658, 670 (Ill. App. Ct. 2004) ("'Intent' refers to objective manifestations of intent in the words of the contract and the actions of the parties; it does not encompass one party's secret, undisclosed intentions or purely subjective understandings of which the other party is unaware.").[6]  In order to determine the intent of the parties, courts in Illinois look to "the language…used in the contract" and give effect to this intent of the parties by considering "the objective manifestations of the parties" in the language of the contract. *United Ironworkers*, 2019 WL 77334 at *6 (quoting *Carey v. Richards Bldg. Supply Co.*, 856 N.E.2d 24, 27 (Ill. App. Ct. 2006)). Where the contract's language is plain, the agreement should be enforced as written. *Id.*

SGLC argues that the TPA is a standard construction industry "Master Subcontract Agreement" that is to serve as a master set of terms and conditions to cover any and all work performed on the project (Doc. 61, p. 2). SGLC admits the TPA does not contain specific pricing for any projects, including the Crab Orchard Project, and explains that the TPA outlines that the price for each contract will be negotiated and agreed-to at a later date for each project, outside of the TPA (*Id.*).[7]  SGLC does not disagree or try to

---

[6] Plaintiff states that "[i]t is interesting to note that the only evidence of the intent of the parties is the Affidavit by Mr. Spirtas. Neither the Defendant, Cunningham, nor anyone else from the Defendant, SGLC, ever offered any evidence except for the unsigned TPA" (Doc. 65, p. 3). Illinois law is clear, though, that a party's subjective belief or understanding is not to be factored into the Court's analysis.

[7] Specifically, SGLC points to the first provision, which states (in its entirety), "For each Project, Subcontractor shall be paid (the "Contract Price") for the Work performed by Subcontractor for each Project, which sum is the complete price, including, but not limited to, all, labor, rental of equipment, tools, permits, licenses, insurance, taxes, bonds, transportation, meals, lodging, overtime, profit, overhead, electric and water meters and supply lines. No other or additional amount shall be paid without a written change order signed by Construction Consultant and Subcontractor. Change orders, signed by both parties, may also reduce the Contract Price. For the Contract Price and other good and valuable consideration, the receipt-and sufficiency of which is hereby acknowledged, Subcontractor and the Construction Consultant hereby agree as follows…" (Doc. 61, p. 15).

argue that the TPA was signed; rather it argues that its signature (or lack thereof) is not fatal to its argument that a contract was formed. The Court agrees.

The role of the Court in this gateway evaluation is to determine whether this TPA was a fully formed contract, thereby making the arbitration provision enforceable. Therefore, the Court will attempt to keep its analysis narrow. The main source of contention between the parties as to whether a contract was formed is whether Defendant SGLC's signature was necessary to officially form the contract. It is true that under Illinois law a written contract generally does not become binding until it is signed by the parties. *AGA S'holders, LLC v. CSK Auto, Inc.*, 467 F. Supp. 2d 834, 845 (N.D. Ill. 2006) (citing *Sterdjevich v. RMK Mgmt. Corp.*, 796 N.E.2d 1146, 1157 (Ill. App. Ct. 2003)). In addition, where it is clear the parties intended that an agreement would not become binding until it was formally executed, then the agreement is not binding if the parties have not formally executed it. *See Consol. Bearings Co. v. Ehret–Krohn Corp.*, 913 F.2d 1224, 1231 (7th Cir. 1990) (citing *Lynge v. Kunstmann*, 418 N.E.2d 1140, 1144 (Ill. App. Ct. 1981)). *See also Johnson & Bell, Ltd. v. ASA Legal Sys.*, No. 99 C 8327, 2000 WL 139473, at *5 (N.D.Ill. Jan. 31, 2000) (citing *Leekha v. Wentcher*, 586 N.E.2d 557, 561 (Ill. App. Ct. 1991)). Under Illinois law, "'[t]he object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by acts or conduct of the parties.'" *AGA S'holders*, 467 F. Supp. at 846 (internal citations omitted). It is clear that "[i]f a document is signed by the party being charged, the other party's signature is not necessary if the document is delivered to that party and she indicates acceptance through performance." *Id.*, (citing *Meyer v. Marilyn Miglin, Inc.*,, 652 N.E.2d 1233, 1239 (Ill. App.

Ct. 1995)); *see also Consol. Bearings Co.*, 913 F.2d at 1231 (same); *Johnson & Bell, Ltd.*, 2000 WL 139473, at *5 (same). But even if a contract is missing the signature of the party to be charged or both parties, "execution of a contract does not require a signature when the parties' performance indicates they intended to be bound by the agreement" *Serac Inc. v. United Packaging Grp., LLC*, No. 17-C-7872, 2018 WL 1469016, at *4 (N.D. Ill. Mar. 26, 2018) (internal citations omitted). Illinois courts regularly hold that "a party named in a contract may, by his acts and conduct, indicate his assent to its terms and become bound by its provisions even though he has not signed it," and whether a signature is necessary to the formation or performance "depends upon the facts of the case." *In re Pride Aircraft, Inc.*, No. BR 20-81435, 2020 WL 6929428, at *4 (Bankr. N.D. Ill. Oct. 30, 2020) (internal citations omitted). With these principles in mind, the Court turns to the facts of this case.

After Plaintiff signed the TPA on September 1, 2020, he was assured the TPA would be signed by SGLC as well by Cunningham (Doc. 65, pp. 2-3). Plaintiff describes that once it signed the TPA and forwarded it to Cunningham, "it was assumed by the Plaintiff that there was a signed general agreement between the parties to go forward with projects but no agreement or contract as to a specific project" (Doc. 51, p. 3). Plaintiff and SGLC met and engaged in "many Pre-Bid actions," including preparation for the initial asbestos removal and preparing the demolition plan (Doc. 60, p. 4). Plaintiff attended Pre-Bid site visits at SGLC's request, gathering information for demolition and asbestos removal schedules which were used by SGLC to provide to the United States government as part of the bid for this site. *Id.* Furthermore, Plaintiff describes that SGLC requested Plaintiff prepare a series of documents, including a corporate safety plan, that

were "accepted by the Contracting Officer and incorporated into the Prime Contract." *Id.*
Plaintiff's work was incorporated into SGLC's bid to the United States government,
which was accepted on or around September 21, 2020 (*Id.* at pp. 4-5). In fact, both SGLC
and Plaintiff procured payment and performance bonds from Westchester for this project
(*Id.* at p. 5). Soon after, Plaintiff began work at the Crab Orchard Project site and was
introduced to United States government personnel, by SGLC, as the subcontractor on the
project. *Id.* Based on these facts, as alleged by Plaintiff in the complaint, it certainly seems
that both parties assented to the terms of the TPA in their actions after Plaintiff signed it.
*See Landmark Properties, Inc. v. Architects Int'l-Chicago,* 526 N.E.2d 603, 606 (Ill. App. Ct.
1988) (holding that the parties were bound by an arbitration agreement contained in an
unsigned contract due to their conduct); *Serac,* 2018 WL 1469016 at *4 (holding that an
unsigned contract was binding as the parties began performance under said contract). *See
generally NECA-IBEW Rockford Loc. Union 364 Health & Welfare Fund v. A & A Drug Co.,*
736 F.3d 1054, 1058 (7th Cir. 2013), citing *Fyrnetics Ltd. v. Quantum Group, Inc.,* 293 F.3d
1023, 1029 (7th Cir. 2002) ("As a general matter, a party may become bound to
an unsigned contract, including one that contains an arbitration clause, by its…conduct).[8]
In fact, a named party to the contract "'may, by his acts and conduct, indicate his assent
to its terms and become bound by its provisions even though he has not signed it'." *Gupta,*
934 F.3d 705, 713 (7th Cir. 2019) (quoting *Bauer v. Qwest Commc'ns Co., LLC,* 743 F.3d 221,

---

[8]  The Seventh Circuit further explains that a non-signatory party can be bound to a contract through a
variety of different contract-related doctrines, including the doctrines of assumption, agency, equitable
estoppel, veil piercing, and incorporation by reference. *Fyrnetics Ltd.,* 293 F.3d at 1030 (citation omitted).

227 (7th Cir. 2014)) (citations omitted). SGLC repeatedly engaged with Plaintiff after Plaintiff signed the TPA, with the two working together to secure the bid to the U.S. government for the Crab Orchard Project site. SGLC, through its actions, indicated its assent to the terms of the TPA, even though it did not sign the TPA.

Plaintiff argues extensively that a series of emails after the TPA was signed and Plaintiff began work show the TPA is not enforceable. For example, Cunningham sent an email to Plaintiff on November 3, 2020, stating, "[A]t the moment Spirtas is the only company who doesn't have a contract for this project…Going forward all numbers will be in writing and contracts finalized prior to work beginning" (Doc. 51-2, p. 1). The next day, on November 4, 2020, Cunningham sent a second email, discharging Plaintiff from the project. In this email, Cunningham writes, "You are discharged from any work on site and have 48 hours to remove your equipment at a scheduled appointment time set by Spirtas and agreed to by SGLC…All communications will be in writing going forward to make arrangements for the removal of the equipment and make payment for reasonable cost incurred" (Doc. 51-3, p. 1). Finally, Plaintiff points to a December 12, 2020 letter in which SGLC's former counsel[9] wrote to Plaintiff's counsel, explaining that "there is no signed agreement between the parties," which Plaintiff has acknowledged with its request for "payment of the costs incurred by Spirtas in Spirtas' performance," which renders the "Application and Certificate for Payment…a false and material misrepresentation to nay third-party" (Doc. 51-4, p. 1). The Court notes that the

---

[9] This letter was written by a Mr. Hanson, who appears to have been Defendant SGLC's former counsel (Doc. 51, p. 3).

"Application and Certificate for Payment," which was attached to this letter as Exhibit A, was not attached in any Court filing. Defendant SGLC's former counsel explains that "in the absence of a written agreement, Spirtas' remedy is one of quantum meruit or unjust enrichment." *Id.* Plaintiff seems to argue that each of these communications show definitively that the TPA is void. But the main issue with this argument is that none of these communications mention the TPA specifically. The Court could just as easily read these documents to support that the parties intended for the TPA to govern their general relationship before they met to develop a specific contract with pricing for each project. These documents also highlight a major fault in Plaintiff's argument—ultimately, the Court is not examining the parties' subjective understandings or personal intents; rather, the Court is looking to the objective terms of the TPA and the parties' actions after. The parties do not need to "share the same subjective understanding as to the terms of the contract." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.,* 515 N.E.2d 61, 65 (Ill. 1987). But "there must be a meeting of the minds or mutual assent as to the terms of the contract." *Id. See also Sgouros,* 817 F.3d at 1034. And this mutual assent is shown through their concerted efforts to begin work after the TPA was signed by Plaintiff.

Plaintiff's arguments, generally, are underdeveloped. Plaintiff cited to only one case in support of its response to the motion to dismiss, in which the Northern District of Illinois determined that the terms of a settlement agreement were too indefinite because "all that was agreed to was that the payment as to be secured in some fashion" with "no other terms…spelled out." *IMI Norgren, Inc. v. D&D Tooling MFG, Inc.,* 306 F. Supp. 2d 796, 802 (N.D. Ill. 2004). Specifically, in *IMI Norgren,* the court found that the settlement

agreement was not enforceable, as parts were made orally to one another; one of the signing parties was, in fact, not authorized to enter into a settlement agreement binding his client; and there were material issues still being negotiated. *Id.* The Court fails to see how this case is analogous, even when considering Plaintiff's characterization of the facts. The parties were not still negotiating terms of the TPA and Plaintiff is not arguing that certain verbal agreements were made that were not reflected in the TPA; rather, Plaintiff relies heavily on the fact that SGLC did not sign the TPA to show it is invalid, which is unsupported by the cases outlined herein.

The Seventh Circuit, courts within this district, and Illinois courts utilize the objective theory of contract formation, looking at the plain terms of the document itself, to determine the parties' intentions. *See, e.g., Gupta,* 934 F.3d at 712; *Sgouros.,* 817 F.3d at 1034; *Beverly,* 817 F.3d at 333; *United Ironworkers, Inc.,* 2019 WL 77334 at *6; *Int'l Minerals & Chem. Corp. v. Liberty Mut. Ins. Co.,* 522 N.E.2d 758, 784 (Ill. App. Ct. 1988) ("The paramount objective is to give effect to the intent of the parties as expressed by the terms of the agreement."). In fact, this principle even extends when one party argues that a provision was added as surprise. For example, the Seventh Circuit upheld a district court's decision that found a contract was formed even when a party argued that the arbitration provision was an "element of surprise" because the terms of the agreement to arbitrate were unambiguous. *Johnson v. Orkin, LLC,* 928 F. Supp. 2d 989, 1007 (N.D. Ill. 2013), aff'd, 556 F. App'x 543 (7th Cir. 2014). The *Johnson* plaintiff argued that no one had explained that by signing the arbitration agreement, the plaintiff waived his right to trial. The term, at issue, stated, "I specifically understand that by agreeing to arbitrate, I waive

any right to a trial by a judge or jury in favor of having such disputes resolved by arbitration." *Id., McWane, Inc. v. Crow Chi. Indus., Inc.,* 224 F.3d 582, 584 (7th Cir.2000) ("The unambiguous contract controls over contrary allegations in the plaintiff's complaint."). Ultimately, the court found that because the plaintiff *signed* the contract, that party could not argue they were surprised by the terms. *Id.* In Illinois a party to a contract is charged with knowledge of and assent to a signed agreement. *Faulkenberg v. CB Taxx Franchise Sys., LP,* 637 F.3d 801, 809 (7th Cir. 2011), (citing *Melena,* 847 N.E.2d at 109). Put in even simpler terms, the Seventh Circuit has noted that a signature on a contract "which [the plaintiff] admit[ted] was given voluntarily…objectively demonstrated his assent to the contract." *Janiga,* 615 F.3d at 743. Here, the TPA's final provision details that "[t]his Agreement has been fully negotiated between the parties at arm's length and neither party has been coerced to execute it" (Doc. 61, p. 18). While Plaintiff attempts to argue that there was no consideration and this contract was never formed because it was a "form" contract, Plaintiff did sign it. Under the objective view of contract formation, Plaintiff cannot call into question the validity of a document through his own subjective thoughts and intentions.

For all of these reasons, and considering the federal policy favoring arbitration, the Court finds that the lack of SGLC's signature does not negate the TPA as a whole, and SGLC and Plaintiff did, in fact, enter into a contract. *Collins v. Citibank, N.A.,* No. 21-CV-00008, 2022 WL 683661, at *2 (N.D. Ill. Mar. 8, 2022) ("The [FAA] 'reflects both a liberal federal policy favoring arbitration…and the fundamental principles that arbitration is a matter of contract'.") (internal citations omitted). As such, the arbitration provision

stands and SGLC's motion to dismiss must be granted. Dismissal, and not a stay as to Count I of Plaintiff's complaint as it relates to SGLC, is appropriate because the Seventh Circuit dictates that under § 4 of the FAA, a district court cannot compel arbitration outside the confines of its district. *Faulkenberg*, 637 F.3d at 808 ("a Rule 12(b)(3) motion to dismiss for improper venue, rather than a motion to stay or to compel arbitration, is the proper procedure to use when the arbitration clause requires arbitration outside the confines of the district court's district."); *Haber v. Biomet, Inc.*, 578 F.3d 553, 558 (7th Cir. 2009) ("[O]nly the district court *in that forum* can issue a § 4 order compelling arbitration.). The TPA outlines that arbitration is to occur in "Edwards, CO before one arbitrator" (Doc. 47, p. 11). As Edwards, Colorado is outside this district, dismissal is appropriate and SGLC's motion to dismiss is granted.

### C. Plaintiff's Additional Arguments Related to Whether the TPA is a Valid and Legal Contract

The Court will address Plaintiff's other arguments as well, albeit briefly, as the Court has already determined that Count I as to SGLC must be dismissed for the parties to seek arbitration. Plaintiff argues that the TPA contains inconsistencies which show a lack of mutual assent, thereby making the TPA unenforceable. Specifically, as described previously, Plaintiff points to a provision of the TPA that states, "The exclusive venue relating to this Agreement shall be in the State where each Project is located."[10] Plaintiff argues this provision is inconsistent with another provision that states, "Any dispute, claim or controversy arising out of or relating to this Agreement or the breach,

---

[10]  The full text of Provision 10 of the TPA is previously included in this Order. *See supra* note 5.

termination, enforcement, interpretation or validity thereof…shall be determined by arbitration in Edwards, CO" (Doc. 61, p. 18). Plaintiff argues that because these provisions conflict, it shows there was no "meeting of the minds" between SGLC and Plaintiff, and the TPA is not enforceable (Doc. 65, pp. 7-8).

This argument is underdeveloped, as Plaintiff does not explain, beyond repeating conclusory contract-law buzzwords (*e.g.*, mutual assent, negotiation, and meeting of the minds), how these inconsistencies show that the entire TPA is unenforceable. The Court has "no duty to research and construct legal arguments available to a party." *Kossman v. Northeast Illinois Regional Commuter R.R. Corp.*, 211 F.3d 1031, 1038 (7th Cir. 2000) (internal citations and quotations omitted); *see also Raghunathan v. Holder*, 604 F.3d 371, 378 (7th Cir. 2010) ("[S]tating blankly what one's argument *is* and actually *arguing* a position are different things.") (emphasis in original). With that said, if Plaintiff is arguing that certain provisions are underdeveloped, vague, or even conflicting, a contract in Illinois does not fail "if the court is able from the terms and provisions thereof, under proper rules of construction and applicable rules of equity, to ascertain what the parties have agreed to do." *Noe v. Smart Mortg. Centers, Inc.*, No. 21 CV 1668, 2021 WL 4283027, at *2 (N.D. Ill. Sept. 21, 2021) (citing *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709, 716 (7th Cir. 1987) (quoting *Gale v. York Center Cmty. Coop., Inc.*, 21 Ill.2d 86 (1961)). Unlike the *Noe* contract, the TPA is not "skimpy" on details. *Id.* Looking at the plain language of the TPA, it is detailed and accounts for various different issues that could come up within the relationship between the parties. The Court does not agree that the venue provision and the arbitration provision are, necessarily, inconsistent, but regardless, parties'

disagreement regarding how to interpret terms of a contract does not, in and of itself, mean the contract is ambiguous and unenforceable. *Meyer*, 652 N.E.2d at 1238; *USG Corp. v. Sterling Plumbing Group, Inc.*, 617 N.E.2d 69, 71 (Ill. App. Ct. 1993). Furthermore, now that the Court has decided that a contract was formed, any disagreement about the terms or their application must be decided by the arbitrator. *See Zhan,*, 2018 WL 9877970 at *5, quoting *Buckeye*, 546 U.S. at 446 ("Challenges to the validity of the entire contract go to the arbitrator…because arbitration provisions are severable from the remainder of the contract; if a party challenges the contract, 'but not specifically its arbitration provisions, those provisions are enforceable apart from the remainder of the contract'").

This leads the Court to Plaintiff's argument that seems to run throughout its pleadings. At times, Plaintiff seems to argue that the TPA was formed through fraudulent, or improper, means. But the implication of that argument is not necessarily one that Plaintiff wants. If a contract, as a whole, is formed fraudulently, but it contains an arbitration provision, the arbitrator and not the Court must determine if it is a valid contract. *James*, 417 F.3d at 680; *Sweet Dreams Unlim.*, 1 F.3d at 641 n. 4. *See also Buckeye Check Cashing, Inc.,*, 546 U.S. at 444-45; *United Ironworkers, Inc.,* 2019 WL 77334 at *5. Although convoluted, it appears that Plaintiff is arguing just that in his descriptions of Cunningham's behavior. If Plaintiff is attempting to argue that the TPA should be void because SGLC fraudulently induced Plaintiff to sign the TPA or there was any form of deceptive or fraudulent behavior, then that must be settled by the arbitrator and not the Court. *See Prima Paint Corp.*, 388 U.S. at 403; *Zhan*, 2018 WL 9877970 at *5, citing *Buckeye*, 546 U.S. at 443–45, 449   ("[T]he *Prima Paint* rule permits a court to enforce an arbitration

agreement in a contract that the arbitrator later finds to be void."); *Modern Space Design & Decoration (Shanghai) Co., Ltd. v. Lynch*, No. 13 C 4329, 2014 WL 4897322, at *2 (N.D. Ill. Sept. 29, 2014) ("[T]he FAA does not condition the enforceability of a written arbitration provision upon the validity of the contract within which it is contained."). *See also Gore v. Alltel Commc'ns., LLC,* 666 F.3d 1027, 1033-34 (7th Cir. 2012) (conspiracy, unjust enrichment, and fraud claims were subject to arbitration because arbitration clause covered "any dispute arising out of this agreement").

For the aforementioned reasons, the Court finds that the TPA is a fully formed contract pursuant to Illinois contract law principles; therefore the arbitration clause within the TPA is binding. Because the TPA contains an arbitration agreement that arbitration is to take place in Edwards, Colorado, which is outside of this district, dismissal of Count I of Plaintiff's complaint is appropriate. *See Faulkenberg*, 637 F.3d at 808 (citing 9 U.S.C. § 4).

## II.    <u>Cunningham's Motion to Dismiss</u>

The second motion before the Court is Defendant Cunningham's renewed motion to dismiss Count II of Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6) for Plaintiff's failure to state a claim upon which relief may be granted (Doc. 62). In his complaint, Plaintiff asserts that Cunningham "committed fraud, upon several persons" (Doc. 60, p. 9). Specifically, Plaintiff alleges that Cunningham was aware that he was never going to sign the TPA or enter into a written subcontract with Plaintiff, but still assured Plaintiff he would sign the TPA on behalf of SGLC. *Id.* Cunningham made additional fraudulent statements in order to ensure that Plaintiff performed work on the

Crab Orchard Project so that SGLC would be approved for a payment bond and the contract with the government for the site. *Id.*[11]

Cunningham argues that Plaintiff cannot state a claim under the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") because it does not apply to contractor and subcontractor transaction and relationships; rather, it is a statute designed to protect consumers (Doc. 62, p. 3). The only time ICFA applies to companies is when the alleged conduct implicates consumer protection concerns. *Id.* Lastly, Cunningham argues that even if the Court determines that Plaintiff has met the 12(b)(6) standard for his pleadings, Plaintiff cannot assert any claims on behalf of the Government and may only be able to sustain a claim for fraud committed upon Plaintiff himself (*Id.* at p. 5).

Plaintiff disagrees, and argues in its first response (which was incorporated by reference in Plaintiff's second response) that the Court "can probably" take judicial notice that the United States Government is the largest consumer in the United States, as it spends "[b]illions of dollars per year just on construction project like that in the present litigation;" therefore, his claim does incorporate a consumer interest (Doc. 52, p. 4).

---

[11] The Court notes that in Plaintiff's complaint, he appears to cite to two different Illinois statutes. When explaining jurisdiction, Plaintiff outlines that the complaint was filed pursuant to the Miller Act and "The Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510)" (Doc. 60, p. 1). But throughout the body of the complaint, Plaintiff refers to the Consumer Fraud and Deceptive Business Practices Act. *See, e.g., Id.* at p. 8 ("Illinois State Law at 815 ILCS 505/2, Section 2, states, in part: 'Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretenses, false promise, misrepresentation or the concealment of, suppression or omission of any material fact, with the intent that others rely upon the concealment, suppression or omission of such material fact…in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been mislead[sic], deceived or damaged thereby'.") *See generally* 815 ILL. COMP. STAT. 505. The parties address the Illinois Consumer Fraud and Deceptive Business Practices Act in their pleadings, so the Court believes the reference to the Uniform Deceptive Trade Practices Act on one page of the complaint is a typo.

Plaintiff acknowledges that both Plaintiff and SGLC are not in the business of purchasing goods for the general public, but that this Illinois law is not just for the protection of consumers (*Id.*). Plaintiff argues that even though no contract exists between Plaintiff and SGLC, this matter as a whole arises out of a contract with the Federal Government that was impacted by Cunningham's deceitful acts. ICFA is the appropriate avenue for recourse since there is a public policy interest in making sure American taxpayer money is spent in a lawful and proper way (*Id.* at pp. 5-6). With this said, Plaintiff seems to walk this argument back in its second response, detailing that Plaintiff is not requesting damages for any deceptive practices against either the United States government or the bonding company (Doc. 66, p. 2). Ultimately, Plaintiff argues Cunningham's actions fall within the definition of consumer fraud and deceptive practices, as outlined by the ICFA (*Id.* at p. 3). Despite their creativity, Plaintiff's arguments are not supported and Cunningham's motion to dismiss will be granted.

A motion to dismiss under Rule 12(b)(6) addresses the legal sufficiency of the plaintiff's claim for relief, not the merits of the case or whether the plaintiff will ultimately prevail. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss, the court accepts all well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *E.g.*, *Burger v. Cty. of Macon*, 942 F.3d 372, 374 (7th Cir. 2019) (citation omitted). To survive a motion to dismiss, the plaintiff must do more than simply recite the elements of a claim in a conclusory fashion. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1146 (7th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[T]he

'complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Reynolds*, 623 F.3d at 1146 (quoting *Iqbal*, 556 U.S. at 678). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Roberts v. City of Chicago*, 817 F.3d 561, 564–65 (7th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678). The complaint need not, however, contain "detailed factual allegations." *Reynolds*, 623 F.3d at 1146 (quoting *Iqbal*, 556 U.S. at 678).

Courts have held that an "ICFA private cause of action extends only to (1) consumers and (2) non-consumers who have suffered damages resulting from conduct with a consumer nexus, that is, conduct that is either directed toward the market generally or otherwise implicates consumer protection concerns." *Cummings v. TVI, Inc.*, No. 19-CV-1082-JPG, 2020 WL 1065433, at *2 (S.D. Ill. Mar. 5, 2020) (citing *Bank One Milwaukee v. Sanchez*, 783 N.E.2d 217, 221 (Ill. App. Ct. 2003)); *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 436-37 (7th Cir. 1996) (citing *Lake Cnty. Grading Co. of Libertyville v. Advance Mech. Contractors, Inc.*, 654 N.E.2d 1109, 1116 (Ill. App. Ct. 1995). *See also MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 792 (N.D. Ill. 2010). Furthermore, Illinois courts, and the Seventh Circuit, have been clear that claims related to an isolated breach of contract between entities, which are not consumers of each other's goods or services, are actions not covered by ICFA. *See Sabrina Roppo v. Travelers Com. Insur. Co.*, 869 F.3d 568, 595 n. 79 (7th Cir. 2017) (citing *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d at 436-37) (holding that state courts have determined that ICFA "applies to consumer transactions or those having a consumer nexus"); *Cmty. Bank of Trenton v.*

*Schnuck Markets, Inc.*, 887 F.3d 803, 823 (7th Cir. 2018) (citation omitted) (" '[A]ny person' language in the ICFA means that businesses can sometimes sue one another under the statute, but a business plaintiff under the ICFA must show a 'nexus between the complained of conduct and consumer protection concerns,' which we refer to here as the 'consumer nexus test.'"). *See also Lake Cnty. Graining Co.*, 654 N.E.2d at 1113. In order to determine whether Plaintiff can bring a cause of action against Cunningham under ICFA, the Court must look to the parties' relationship. When a dispute is between two businesses that are not consumers, the proper test is "whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Lake Cnty. Graining Co.*, 654 N.E.2d at 1115, (quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989)).

Plaintiff's claim against Cunningham does not implicate consumer protection concerns. Plaintiff attempts to argue that a consumer nexus is, somehow, related to the United States government spending "billions of dollars per year just on construction project[s] like that in the present litigation" (Doc. 52, p. 4). In his renewed response, in which he incorporates by reference his first response, Plaintiff seems to have modified this argument, stating that "Plaintiff is not requesting any damages for any deceptive practices against either the Government or the bonding company" and does not mention a consumer nexus at all (Doc. 66, p. 2). As best the Court can tell, this is the only time Plaintiff attempts to argue a consumer nexus, or implication, which is necessary to sustain his claim. Plaintiff fails to support its arguments about taxpayer money with precedent,

Page 28 of 32

and even Plaintiff seems to argue against himself at times.[12] Courts have repeatedly found that "there is no inherent consumer interest implicated in a construction contract between a general contractor and a subcontract" *Lake Cnty. Grading Co.*, 654 N.E.2d at 1116 , *citing Downers Grove,* 546 N.E.2d 33 (explaining that a deceptive brochure disparaging plaintiff's services, sent by a competitor to 15,000 consumers, could form the "consumer nexus" necessary to support a cause of action between two businesses under ICFA). *See also J&M Plating, Inc. v. Williams Indus. Service, Inc.,* No. 05-C-50113, 2005 WL 8179489, at *5 (N.D. Ill. Dec. 5, 2005) (holding that there was no inherent consumer interest in the fulfillment of contract terms between the parties); *Direct Commc'ns, Inc. v. Horizon Retail Const., Inc.,* 387 F.Supp. 2d 828, 831 (highlighting that the plaintiff did not "even attempt[] to satisfy the consumer nexus requirement and only alleged a breach of contract, which is not actionable under ICFA, thereby granting the motion to dismiss under 12(b)(6). Furthermore, "Illinois court are skeptical of business-v.-business ICFA claims when neither party is actually a consumer in the transaction. ICFA claims may not be available when the business relationship is more like that of 'partners'." *Cmty. Bank of Trenton,* 887 F.3d at 823 (citations omitted).

Plaintiff must plead more than just an individual injury to bring a cause of action under ICFA against Cunningham—he also must explain how Cunningham's behavior impacted consumers. Plaintiff fails to cite to a single case in its renewed response in support of his argument that his claim is actionable under ICFA (Doc. 66). Even when

---

[12] The Court previously outlined a key inconsistency in Plaintiff's argument. *See supra* n. 4.

drawing all reasonable inferences in Plaintiff's favor, Plaintiff has not explained how Cunningham's untruthful and deceptive behavior implicates a consumer interest, as required by the ICFA and the cases examining it. As such, dismissal of Count II is appropriate.

III.   <u>Westchester's Motion to Stay</u>

In Westchester's motion to stay, or in the alternative, motion to dismiss proceedings pending arbitration, Westchester explains that it issued a payment bond, naming SGLC as the principal, in connection with the Crab Orchard Project (Doc. 64, pp. 1-2). Plaintiff asserts its Miller Act claim (Count I of the amended complaint) against Westchester as well as SGLC for repayment (*Id.* at p. 2). Westchester explains it was not part of the arbitration agreement; therefore, the present matter, and the remaining one count against Westchester, should be dismissed or stayed pending the resolution of the arbitration issue between SGLC and Plaintiff. *Id.* Plaintiff opposes the motion mainly on the grounds that Plaintiff believes the Court should not grant the motion to compel arbitration (Doc. 67, pp. 1-2). But, should the Court grant that motion, Plaintiff argues that staying this matter as to Westchester is the more appropriate avenue. *Id.*

As the Court has already identified, the FAA mandates enforcement of valid, written arbitration agreements. *Tinder v. Pinkerton Sec.,* 305 F.3d 728, 733 (7th Cir. 2002); *Circuit City Stores v. Adams,* 532 U.S. 105, 111–12 (2001). To give effect to the federal policy favoring private arbitration, the FAA provides for stays of litigation when an issue presented in the case is referable to arbitration. 9 U.S.C. § 3; *EEOC v. Waffle House, Inc.,* 534

U.S. 279 (2002).[13] The Court has already decided to dismiss the Miller Act claim against SGLC because under Section 4 of the FAA, a district court cannot compel arbitration outside the confines of its district. *Faulkenberg*, 637 F.3d at 808 (citing *Haber v. Biomet, Inc.*, 578 F.3d 553, 558 (7th Cir.2009)) ("[O]nly the district court in that forum can issue a § 4 order compelling arbitration. Otherwise, the clause of § 4 mandating that the arbitration and the order to compel issue from the same district would be meaningless.") (quotation marks omitted). So all that remains is to determine what to do with Count I against Westchester.

The parties agree that Westchester is not part of the arbitration agreement that is the basis for dismissal of the Miller Act claim against SGLC. Therefore, the Court believes a stay of this case and the Miller Act claim as it relates to Westchester is more appropriate. This is because not all of Plaintiff's Miller Act claim is subject to arbitration. *See Cigna Healthcare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 851 (7th Cir.2002) (district court "should not dismiss the proceedings before it" while arbitrability is being determined in another forum); *Imperial Crane Sales, Inc. v. Sany Am., Inc.*, No. 15-C-859, 2015 WL 4325483, at *5 (N.D. Ill. July 15, 2015) (*Tice v. Am. Airlines, Inc.*, 288 F.3d 313, 318 (7th Cir.2002) ("rather than dismiss the present suit the district judge should have stayed it to await the outcome of arbitration in order to spare the parties the burden of a second litigation should the

---

[13] "For arbitrable issues, a § 3 stay is mandatory." *Volkswagen of Am., Inc. v. Suds of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir.2007); 9 U.S.C. § 3 ("the court ... **shall** on application of one of the parties stay the trial of the action until such arbitration has been had" (emphasis added)).

arbitrators fail to resolve the entire controversy").[14] Balancing the parties' desires, the Court believes it prudent to stay the case to ease the burden on the parties of multiple proceedings in separate forums. For these reasons, the Court hereby **STAYS** this case and the Miller Act claim as it relates to Westchester.

CONCLUSION

For the aforementioned reasons, the Court hereby **GRANTS** Defendant SGLC's motion to dismiss and **DISMISSES** Count I of Plaintiff's complaint, as the parties are subject to arbitration in a forum outside this district (Doc. 61). The Court also **GRANTS** Defendant Cunningham's motion to dismiss (Doc. 62). Finally, Defendant Westchester's motion to stay is similarly **GRANTED** in part and the remaining Miller Act Claim against Defendant Westchester is **STAYED** pending the outcome of arbitration (Doc. 63).

    **IT IS SO ORDERED.**

    **DATED: June 13, 2022**

                                        s/ Mark A. Beatty
                                        **MARK A. BEATTY**
                                        **United States Magistrate Judge**

---

[14] Dismissal is appropriate, at times, when there are no outstanding claims. *See Taylor v. Samsung Elecs. Am.*, No. 16-C-50313, 2018 WL 3921145, at *7 (N.D. Ill. Aug. 16, 2018) (citing *HTG Capital Partners, LLC v. Doe*, No. 15-c-02129, 2016 WL 612861 (N.D. Ill. Feb. 16, 2016) ("dismissing rather than staying is sensible because there is nothing for the court to decide").